UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

TWELVE THOUSAND ONE HUNDRED EIGHTY
SIX DOLLARS ($12,186.00) IN U.S. CURRENCY;
NINETEENTH-CENTURY FRENCH EMPIRE
STYLE HARP; 1960 FRENCH STYLE BRONZE
ORMOLU AND MARBLE CLOCK; SEVEN (7)
ASSORTED PAINTINGS; FOUR (4) ASSORTED
METALLIC SCULPTURES; THIRTY FOUR (34)
ASSORTED CRYSTAL GLASS VASES AND
FIGURINES; EIGHT (8) ASSORTED
SCULPTURES/FIGURINES;

                Defendants *in Rem*.

Civil No.
Honorable

_____\\

## COMPLAINT FOR FORFEITURE

NOW COMES Plaintiff, United States of America, by and through its

counsel, BARBARA L. McQUADE, United States Attorney for the Eastern District

of Michigan, and PAUL A. KUEBLER, Assistant United States Attorney, and states

upon information and belief in support of this Civil Complaint for Forfeiture *in rem*

that:

1.   This action is a civil forfeiture action pursuant to 21 U.S.C. § 881(a)(6).

## JURISDICTION AND VENUE

2.   This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C.

§ 1345 as this action is being commenced by the United States of America as

Plaintiff.

3.   This Court has jurisdiction over this forfeiture action, pursuant to 28 U.S.C. §

1355(b)(1)(A), as the acts giving rise to the forfeiture occurred in the Eastern

District of Michigan.

4.   Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2), as a

substantial part of the events or omissions giving rise to the Government's

claims occurred in the Eastern District of Michigan.

5.   Venue is also proper before this Court pursuant to 28 U.S.C. § 1395(b), as the

defendants *in rem* were found, and were seized, in the Eastern District of

Michigan.

## DEFENDANTS *IN REM*

6.   The defendants *in rem* are as follows:

a.   Twelve Thousand One Hundred Eighty Six Dollars ($12,186.00) in
U.S. Currency;

b.   Nineteenth-Century French Empire Style Harp;

2

    c.      1960 French Style Bronze Ormolu and Marble Clock;

    d.      Seven (7) Assorted Paintings;

    e.      Four (4) Assorted Metallic Sculptures;

    f.      Thirty Four (34) Assorted Crystal Glass Vases and Figurines;

    g.      Eight (8) Assorted Sculptures/Figurines;

7.    The defendants *in rem* are currently in the custody of the United States Marshals Service.

## STATUTORY BASIS FOR CIVIL FORFEITURE

8.    Title 21, United States Code, Section 881, governs the civil forfeiture of property which constitutes or is derived from the proceeds of narcotics crimes, or which was used to facilitate narcotics crimes:

> The following shall be subject to forfeiture to the United States and no property right shall exist in them .... [a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.
> 21 U.S.C. § 881(a)(6).

## FACTUAL BASIS SUPPORTING FORFEITURE

9.    The defendants *in rem* constitute the proceeds of illegal activity and/or are traceable to the proceeds of illegal activity, specifically controlled substance

offenses in violation of 21 U.S.C. § 841 and § 846, and are, therefore, subject to seizure and civil forfeiture to the United States, pursuant to 21 U.S.C. § 881(a)(6). The facts and evidence in support of forfeiture include, but are not limited to, the following:

## OVERVIEW

10.   Investigation has revealed that Mamoun DABBAGH, M.D. (Dr. DABBAGH) was prescribing Vicodin (Hydrocodone), Xanax (Alprazolam), and Adderall to patients outside the normal course of professional practice and for no legitimate medical purpose.

11.   Title 21 CFR § 1308.13(e)(l)(iv) lists Vicodin (APAP Hydrocodone Bitartrate) as a Schedule III controlled substance until October 6, 2014, whereafter it became a Schedule II controlled substance. The 2010 Physicians' Desk Reference, 64th edition, states that Vicodin is for the management of moderate to moderately severe pain, that the generic name for Vicodin is hydrocodone and acetaminophen, and that brand names of Vicodin include Lortab, Lorcet, and Norco.

12.   Title 21 CFR § 1308.12(d)(l) lists Adderall/Adderall XR (Amphetamine) as a Schedule II controlled substance. The 2010 Physicians' Desk Reference cites certain warnings and precautions when prescribing Adderall. Amphetamines

have been extensively abused and can cause extreme psychological dependence. Adderall has the potential for being abused and is sought by abusers and people with addiction disorders, and is the subject of diversion.

13. Title 21 CFR § 1308.14(c)(l) lists Xanax (Alprazolam) as a Schedule IV controlled substance.

14. Drug Enforcement Administration (DEA) investigators are aware that Adderall/Adderall XR, Xanax, and Vicodin are highly abused and diverted controlled substances; Adderall/Adderall-XR has street value of approximately $5 per tablet; Xanax sells for approximately $2-3 per tablet; and Hydrocodone sells for approximately $5 per tablet. DEA investigators are also aware that combinations of controlled substances, to include Adderall, Xanax, and Vicodin, are combinations that are currently at a high rate of abuse in the Southeastern Michigan area.

15. The Michigan Automated Prescription System (MAPS) is the prescription monitoring program for the State of Michigan. MAPS collects all prescription and dispensing information for Schedule II-V controlled substances prescribed or dispensed within the State of Michigan. MAPS is available to Michigan practitioners, enabling them to determine whether patients are

receiving controlled substances from other providers, thereby assisting in the prevention of prescription drug abuse.

16. Medical doctors who have rendered opinions in physician cases involving large-scale prescribing of controlled substances for non-legitimate purposes have concluded that the following improprieties often occur in such situations:

a. The doctor-patient relationship on initial visits was not established or the relationship on follow-up visits was not established or maintained;

b. The physician engages in "polypharmacy," or the prescribing of "drug cocktails" of controlled substances often including opioids, benzodiazepines and other controlled substances, which greatly increases the chance for drug abuse, diversion, and addiction;

c. Controlled substance prescriptions are often prescribed without evaluating and/or diagnosing medical conditions that would justify those prescriptions;

d. Controlled substance prescriptions are often continually given to persons who exhibited drug-seeking behavior;

e. Controlled substance prescriptions are often prescribed without adequate informed consent and appropriate monitoring; and

6

      f.     Physicians often treated persons without an individualized plan of

care and instead used essentially the same treatment on each person.

17.    A review of MAPS data for Dr. DABBAGH shows that the majority of his

patients received Adderall. DEA investigators believes it is highly unlikely

that a legitimate physician's office would prescribe a specific controlled

substance to such a high percentage of patients.

18.    Until early 2015, Dr. DABBAGH was registered with the DEA as a practitioner

in Schedules II through V. He was registered with DEA as a practitioner at

28800 Ryan Suite #320, Warren, MI 48092. Dr. DABBAGH's prescription pad

lists his business address as 28800 Ryan Suite #320, Warren, MI 48092.

19.    According to the State of Michigan Department of Community Health, Dr.

DABBAGH has been licensed as a medical doctor in Michigan since October

18, 1982.

20.    Under 21 CFR §1306.04(a) Dr. DABBAGH was entitled to issue prescriptions

for controlled substances, provided they were issued for a legitimate medical

purpose and he was acting in the normal course of his professional practice.

21.    A confidential source (CS-1) identified three patients who were illegally

prescribed controlled substances by Dr. DABBAGH. Investigation revealed

that these three patients were simply obtaining prescription pills for resale

and not for the purpose of treating any medical conditions. CS-1 further

stated that Dr. DABBAGH had acknowledged, during in-person meetings,

both inside and outside Dr. DABBAGH's office, that Dr. DABBAGH was

aware of this diversion of the controlled substances that he was prescribing.

This information was corroborated as to these patients by a Source of

Information (SOI-2). SOI-2 was one of these three patients, and had a

personal association with the other two patients.

   a.   Investigation revealed that Dr. DABBAGH prescribed to patient A.S.,

        between January 1, 2013 and December 31, 2013, 330 Vicodin; 1350

        Alprazolam; 240 Diazepam; 1110 Amphetamine Salt; 630

        Phentamine HCL; and 150 Dextroamph SACC/Amph/ASP/Dextroam

        S, all without any medical exam and for no medical purpose.

   b.   Investigation revealed that Dr. DABBAGH prescribed to patient

        M.C., between January 1, 2013 and December 31, 2013, 300

        Amphetamine Salt; 180 Dextroamph SACC/Amph/ASP; and 420

        Alprazolam, all without any medical exam and for no medical

        purpose.

   c.   Investigation revealed that Dr. DABBAGH prescribed to patient M.E.

        between January 1, 2013 and December 31, 2013, 270 Amphetamine

Salt; 270 Hydrocodone Bitartrate and Acetamin; 150 Alprazolam; and

180 APAP/Hydrocodone Bitartrate, all without any medical exam and

for no medical purpose.

22.   A review of MAPS identified patient J.B., who received multiple

prescriptions for controlled substances from multiple doctors. J.B. received

the following from Dr. DABBAGH between January 1, 2013 and December

31, 2013: 60 Amphetamine Salt; 330 Hydrocodone Bitartrate and Acetamin;

360 Alprazolam; 240 APAP/Hydrocodone Bitatrate; and 210 Phentemine

Hydrochloride.

23.   A review of Dr. Dabbagh's MAPS report indicates that a large number of his

patients paid cash. DEA investigators know that a high percentage of

patients paying cash is a red flag suggesting that the patients are receiving an

illegitimate service that would not be covered by insurance.

24.   According to MAPS, between January 2011 and January 2014 Dr.

DABBAGH'S office prescribed approximately 1,530,992 dosage units of

Schedule II narcotics, 663,302 dosage units of Schedule III narcotics, and

1,994,459 dosage units of Schedule IV. Below are the totals for each year:

| YEAR | 2011 | 2012 | 2013 | JAN-JUNE 2014 |
|------|------|------|------|---------------|
| Schedule II | 534,407 | 356,194 | 640,391 | 296,406 |

| Schedule III | 301,217 | 213,422 | 148,663 | 50,966  |
| Schedule IV  | 688,247 | 487,020 | 819,192 | 455,404 |

25.    According to MAPS, for the period January 1, 2013 through January 31,

2014, Dr. DABBAGH wrote 25,773 prescriptions for a total of 1,626,629

dosage units.

26.    Dr. DABBAGH is a licensed psychiatrist. DEA investigators know that

psychiatric practices do not typically prescribe such large numbers of

scheduled controlled substances other than certain Schedule IV drugs to

control anxiety. The majority of Dr. DABBAGH's Schedule IV prescriptions

were for Xanax, and Xanax is a drug that is often prescribed by psychiatrists.

However, MAPS shows that the majority of Dr. DABBAGH's Xanax

prescriptions were a 2mg dose, which is the highest prescribed dose available.

It is uncommon for a legitimate physician to prescribe such a high percentage

of the highest does of the controlled substance available. In addition, these

numbers show that Dr. DABBAGH's controlled substance prescribing

practice changed significantly during a three year period. DEA investigators

know that it is highly unusual for legitimate practitioners to significantly

change their prescribing of controlled substances from year to year.

27.     A MAPS report for Dr. DABBAGH for the time period January 1, 2013 through December 31, 2013 reveals that Dr. DABBAGH wrote in excess of 50,000 dosage units of opiate based pain medication, which is a much higher number of opiate prescriptions within a year than are written by doctors practicing psychiatry. Opiate painkillers are not normally prescribed by psychiatrists in significant volume.

28.     The MAPS reporting system shows patient addresses, and indicates that between January 1, 2013 and December 31, 2013 several of Dr. DABBAGH's patients lived at the same address and received the same medications. The prescribing of the same controlled substances to people who reside together is indicative of diversion, because it is common for patient "runners" to solicit multiple parties at one address to obtain controlled substances from a compliant physician. MAPS shows that Dr. DABBAGH prescribed the same controlled substances to:

151 residences with 2 patients
26 residences with 3 patients
3 residences with 4 patients
2 residences with 5 patients

29.     DEA investigators have observed that current unlawful drug diversion in Southeast Michigan frequently includes combinations of controlled

substances that include Hydrocodone (Vicodin, Norco), Alprazolam (Xanax), and Amphetamine Salt (Adderall). Addictionologists, pharmacists, toxicologists, and self-proclaimed drug addicted individuals have all stated that Alprazolam increases the "high" of opiates, which results in the combination of Alprazolam and opiates to be highly sought for illegitimate use.

30.   MAPS shows that one residence included 3 patients – B.B.-1, N.B., and B.B.-2 – to whom Dr. DABBAGH prescribed 2,490 dosage units of Schedule II narcotics, 720 dosage units of Schedule III narcotics, and 2,580 dosage units of Schedule IV narcotics between January 2013 and January 2014. The following shows what this residence received just in January 2014:

| Patient Name | Drug | Date Written | Quantity |
|---|---|---|---|
| B.B.-1 | Amphetamine Salt | 1/22/14 | 90 |
| B.B.-1 | Hydrocodone Bitartrate/Ace | 1/27/14 | 90 |
| B.B.-1 | Amphetamine Salt 30mg | 1/2/14 | 90 |
| B.B.-1 | Alprazolam 2mg | 1/27/14 | 60 |
| B.B.-1 | Alprazolam 2mg | 1/2/14 | 60 |
| B.B.-1 | APAP/Hydrocodone 10/325 | 1/3/14 | 90 |
| N.B. | Alprazolam 2mg | 1/23/14 | 90 |
| N.B. | Amphetamine Salt 30mg | 1/23/14 | 90 |

31.     Similarly, MAPS shows that J.P. and A.P. were two patients who shared

another residence, to whom Dr. DABBAGH prescribed 2,360 dosage units of

Schedule II narcotics, 290 dosage units of Schedule III narcotics, and 1,830

dosage units of Schedule IV narcotics prescribed between January 2013 and

January 2014. The following is what they received just in January 2013:

| Patient Name | Drug | Date Written | Quantity |
|---|---|---|---|
| J.P. | Oxycodone Hydro 30mg | 1/16/13 | 100 |
| J.P. | Amphetamine Salt 30mg | 1/16/13 | 90 |
| J.P. | Alprazolam 2mg | 1/16/13 | 90 |
| A.P. | Amphetamine Salt 30mg | 1/16/13 | 90 |
| A.P. | Alprazolam 2mg | 1/16/13 | 90 |
| A.P. | Oxycodone Hydro 30mg | 1/16/13 | 100 |

32.     MAPS indicates that a large number of Dr. DABBAGH's patients live in

excess of 25 miles from his office. DEA investigators have found that drug

abusers often travel long distances to find a doctor who will write

prescriptions for controlled substances, bypassing numerous other doctors

who will not as freely write prescriptions for controlled substances. Below are

examples of a few of the many patients who travel more than 25 miles from

home to see Dr. DABBAGH:

A.B.   Chelsea, MI        64.97 miles

| | | |
|---|---|---|
| A.H. | Marine City, MI | 42.26 miles |
| A.K. | Lapeer, MI | 47.08 miles |
| D.K. | Lapeer, MI | 47.08 miles |
| J.O. | Marine City, MI | 42.52 miles |

33.   Doctors and pharmacists have the ability to run MAPS reports on their

patients to make sure their patients are not obtaining controlled substance

prescriptions from other doctors. The receipt of controlled substances within

the same month from multiple doctors is a strong indication that the patient is

a substance abuser. DEA investigators know that a legitimate medical

practitioner reviews MAPS before prescribing controlled substances, and will

not ordinarily prescribe controlled substances to a patient who is currently

receiving those substances from another source.

34.   MAPS shows that Dr. DABBAGH's office ran nine MAPS reports on A.S. on

10/25/13, 11/7/2013 (twice), 11/22/13, 1/2/14, 1/17/14, 2/17/14, 2/28/14, and

6/16/14. Those reports informed Dr. DABBAGH that A.S. was being

prescribed narcotics from six different physicians at the same time Dr.

DABBAGH was prescribing narcotics to A.S. In January 2014, a month when

Dr. DABBAGH twice ran a MAPS report for A.S., this patient obtained 630

dosage units of opiates, 450 dosage units of Xanax, 330 dosage units of

Adderall and 180 dosage units of Phentermine, based on prescriptions written

14

by Dr. DABBAGH and three other physicians. Nonetheless, Dr. DABBAGH

continued to prescribe controlled substances to A.S.

35.     By way of example only, MAPS also disclosed at least four other patients –

B.B., R.S., K.M., and W.H. – who were obtaining controlled substance

prescriptions simultaneously from Dr. DABBAGH and other doctors. Dr.

DABBAGH's office ran MAPS on both B.B. and R.S. three times each,

which would have revealed to Dr. DABBAGH that each was obtaining

controlled substances from multiple physicians, but Dr. DABBAGH

nonetheless prescribed controlled substances for them. K.M. received

prescriptions for APAP/Hydrocodone Bitartrate and Acetamin 325mg-10mg

on or near the same dates from Dr. DABBAGH and two other doctors. W.H.

received prescriptions for APAP/Hydrocodone Bitartrate 325mg-10mg, and

Amphetamine Salt Combo 20mg, on or near the same dates from Dr.

DABBAGH and two other doctors.

36.     MAPS shows that at least one of Dr. DABBAGH's patients received

prescriptions for both narcotic pain medications and medications to treat

addiction to narcotics. Patient F.G. received prescriptions for

APAP/Hydrocodone Bitartrate 325mg-10mg, Oxycontin 40mg, and

Suboxone 8mg-2mg within thirty days of each other. Suboxone is a

medication specifically prescribed for the treatment of addiction to opiates. A doctor practicing legitimate medicine would not prescribe both an opiate pain killer such as Oxycontin and Suboxone (to treat opiate addiction) to the same patient in such a short time period.

37.   A random check for criminal histories of thirty names of Dr. DABBAGH's patients from MAPS shows that eighteen had a criminal history with drug-related convictions in addition to other convictions for crimes related to assaults, property crimes, and traffic offenses. The other twelve patients had no criminal histories.

38.   A MAPS report for Dr. DABBAGH for the period January 1, 2013 through January 31, 2014 indicates that DR. DABBAGH wrote numerous prescriptions, totaling in excess of 17,000 dosage units of controlled substances, to "First Floor Stock," "Second Floor Stock," and "Third Floor Stock," rather than to a named patient. MAPS further reports that the various "Stocks" are described as having birth dates, and the dates of birth vary over time. In other words, "First Floor Stock" is treated as a person for purposes of receiving the prescription for controlled substances. Investigators specializing in health care fraud are unaware of any legitimate reason for a medical practitioner to prescribe controlled substances to "stock" rather than to a true

16

person. These prescriptions were written in violation of Title 21 CFR §

1306.04(b), which provides that "[a] prescription may not be issued in order

for an individual practitioner to obtain controlled substances for supplying the

individual practitioner for the purpose of general dispensing to patients."

### INTERVIEW WITH CONFIDENTIAL SOURCE

39.   On March 6, 2014 DEA interviewed CS-1. The information provided has

been corroborated through interviews, reviews of MAPS, and physical

surveillance of Dr. DABBAGH. CS-1 stated that he/she is personally

associated with Dr. DABBAGH and has seen first-hand the diversion of

controlled substances through fraudulent prescriptions. CS-1 stated that

he/she has purchased controlled substance prescriptions from Dr. DABBAGH

for $75 for each prescription without having a medical need for the

prescriptions. CS-1 stated that Dr. DABBAGH never conducted any type of

medical examination or tests prior to prescribing the controlled substances.

40.   CS-1 stated that at the request of Dr. DABBAGH he/she began bringing other

patients to see Dr. DABBAGH to obtain controlled substance prescriptions

despite no medical need for them. CS-1 stated that Dr. DABBAGH would

charge each new patient $150 cash for the initial visit, $75 cash for any

subsequent visits, and $75 cash for each prescription he wrote. CS-1 stated

that Dr. DABBAGH stopped charging him/her money for prescriptions due to the volume of new patients that CS-1 brought to Dr. DABBAGH.

41. CS-1 stated that he/she met Dr. DABBAGH at a variety of places outside of Dr. DABBAGH's physical office location where Dr. DABBAGH wrote him/her prescriptions for controlled substances for whatever CS-1 requested. CS-1 stated that he/she and Dr. DABBAGH frequented adult entertainment clubs together where CS-1 observed Dr. DABBAGH write prescriptions for controlled substances to female employees in exchange for sexual favors. CS-1 stated Dr. DABBAGH would bring his prescription pad, contained in a fanny pack, into the adult entertainment clubs.

42. CS-1 stated that he/she personally observed several patients come to Dr. DABBAGH's residence, which CS-1 identified as a condominium located at 5000 Town Center, Southfield, Michigan and obtain prescriptions directly from Dr. DABBAGH. CS-1 stated that he/she has personally seen Dr. DABBAGH leave prescriptions for patients at the front desk of his condominium or with the valet parking attendants. CS-1 also stated he/she has been present when patients have contacted Dr. DABBAGH via cell phone either through calls or text messages requesting prescriptions for controlled substances.

43.   CS-1 stated that he/she has personal knowledge through observations at Dr.
DABBAGH's office that Dr. DABBAGH has provided physician assistants
with pre-signed prescriptions which they provide to patients who come in for
refills, without any physical examination. Investigation revealed that Dr.
DABBAGH never conducted any type of medical examination/tests on any of
the new patients CS-1 brought to him. CS-1 stated that Dr. DABBAGH
utilized numerous patient rooms in his office and that none of the rooms
contained any type of medical equipment for examination of the patients.
Rather, the rooms mainly consisted of a wooden table and two chairs.

44.   CS-1 stated that he/she obtained prescriptions for controlled substances from
Dr. DABBAGH solely for the purpose of resale on the street and for profit.
CS-1 stated that Dr. DABBAGH was aware that he/she was selling the
prescriptions for profit, as they discussed this on several different occasions.
Investigation revealed that the majority of the new patients that CS-1 took to
Dr. DABBAGH were obtaining controlled substance prescriptions for resale
on the street for profit.

45.   CS-1 identified several purported patients of Dr. DABBAGH whose names
he/she provided to Dr. DABBAGH so they could illegally obtain
prescriptions for controlled substances.

## INTERVIEW WITH SOURCE OF INFORMATION 2

46.    On April 5, 2014 agents interviewed a source of information (SOI-2), in Mt.

Clemens, Michigan. SOI-2 stated that he/she had been acquainted with Dr.

DABBAGH for approximately two years. SOI-2 stated that he/she was

introduced to Dr. DABBAGH by another patient of Dr. DABBAGH who told

SOI-2 that Dr. DABBAGH would write him/her prescriptions for Xanax,

Adderall, and Vicodin.

47.    SOI-2 stated that when he/she saw Dr. DABBAGH for the first time he/she

told Dr. DABBAGH that he/she needed medications to stay awake to study

and for stress. SOI-2 stated that, without any type of medical examination or

tests, Dr. DABBAGH gave him/her prescriptions for Adderall, Xanax, and

Vicodin. SOI-2 stated that he/she paid $175 cash for the initial visit, but SOI-2

had insurance so he/she was not charged for any subsequent visits and Dr.

DABBAGH'S office just billed his/her insurance.

48.    SOI-2 stated that on occasion he/she would give Dr. DABBAGH marijuana

during office visits. SOI-2 stated that he/she never observed any type of

medical equipment in any of Dr. DABBAGH's patient rooms. SOI-2 also said

that he/she observed several patients coming in and out of Dr. DABBAGH's

during very short time periods. SOI-2 stated that on other occasions he/she

went to Dr. DABBAGH's office but never saw Dr. DABBAGH. SOI-2 stated

that on these occasions other employees at Dr. DABBAGH's office already

had pre-signed and stamped prescriptions signed by Dr. DABBAGH, which

the employees would complete for whatever controlled substance SOI-2

requested.

49.   SOI-2 stated that after becoming acquainted with Dr. DABBAGH he/she saw

Dr. DABBAGH at numerous adult entertainment establishments throughout

the Detroit area. SOI-2 states that he/she personally saw Dr. DABBAGH

write out prescriptions to female employees at these establishments.

Investigation revealed that the female employees would trade sexual favors

for these prescriptions.

50.   SOI-2 identified several additional purported patients of Dr. DABBAGH who

either do not exist or who exist and illegally obtained prescriptions for

controlled substances.

INTERVIEW WITH NEW BALTIMORE CONFIDENTIAL SOURCE

51.   On April 19, 2014 DEA agents interviewed a New Baltimore Confidential

Source (CS-2), in New Baltimore, Michigan. CS-2 stated that he/she has had a

pill addiction for approximately four years. On this date CS-2 had been

arrested for possession of OxyContin, Vicodin, and Adderall pills. CS-2

stated that he/she was selling Adderall and Subutex that he/she obtained from

Dr. DABBAGH. CS-2 stated that he/she used the money from selling these

pills to buy OxyContin and Vicodin for personal use.

52. CS-2 stated that he/she first saw Dr. DABBAGH in January 2014, at which

time he/she advised Dr. DABBAGH that he/she was currently abusing

OxyContin and Vicodin, after which Dr. DABBAGH prescribed him/her

Subutex. CS-2 stated that at no time did Dr. DABBAGH perform any type of

medical examination, evaluations, or tests. CS-2 stated that the patient room

where he/she met Dr. DABBAGH consisted only of an office table and chairs.

CS-2 stated that the patient room did not contain any type of normal medical

equipment for a doctor's office, such as stethoscopes, blood pressure cuffs,

tongue depressors, etc. CS-2 stated that he/she paid $75 cash for the office

visit.

53. CS-2 stated that he/she went back to Dr. DABBAGH's office in March of

2014, and met with a female who works in the office. CS-2 stated that he/she

asked this female for Adderall. CS-2 stated that the female told him/her she

would have to check with Dr. DABBAGH and left the room. CS-2 stated that

shortly after this the female returned and wrote a prescription for Adderall and

Subutex on a prescription form that was already signed by Dr. DABBAGH.

54.    CS-2 identified several additional purported patients of Dr. DABBAGH who

either do not exist or who exist and illegally obtained prescriptions for

controlled substances.

## UNDERCOVER ACTIVITY

55.    On April 30, 2014, CS-2, acting in an undercover capacity, met with Dr.

DABBAGH at his office. CS-2 stated that immediately upon entering Dr.

DABBAGH's office he/she observed that the lobby was full and most of the

patients were female. CS-2 stated that office employees came into the lobby

and called two to three people at a time to go into the exam rooms. CS-2 stated

that he/she was called back into the exam rooms at the same time as two other

patients. CS-2 stated that he/she was placed into an exam room that consisted

of a wooden desk and a chair on both sides of the desk. CS-2 stated that there

was no medical equipment in this room. CS-2 stated that Dr. DABBAGH

came into the exam room with his/her file and a very large stack of

prescriptions. CS-2 stated that Dr. DABBAGH only asked whether CS-2 was

just there for prescriptions, to which CS-2 responded "yes." CS-2 stated that

he/she also informed Dr. DABBAGH that he/she was having trouble sleeping

and had back pain. CS-2 stated that Dr. DABBAGH then wrote out several

prescriptions, placed them in the file and said they were all done. CS-2 said

DR. DABBAGH then gave the file to a white female at the counter, and CS-2

went back into the lobby. CS-2 stated that when he/she went back into the

lobby, he/she observed that numerous new patients had arrived. CS-2 stated

that the white female at the counter told CS-2 that the charge was $75 cash.

CS-2 stated that he/she paid and was then given three prescriptions, two of

which were for controlled substances Adderall and Subutex.

56.    On June 4, 2014, CS-2, acting in an undercover capacity, again met with Dr.

DABBAGH at his office. CS-2 stated that upon entering the lobby he/she

observed that the lobby was very full of patients. CS-2 stated that he/she was

called back into a patient room that was different from CS-2's previous visit.

CS-2 stated that the patient room only contained a table and two chairs. CS-2

stated that when Dr. DABBAGH came in he again had the very large

prescription pad with him. CS-2 stated that Dr. DABBAGH did not conduct

any type of physical examination or evaluation. CS-2 stated that he/she asked

Dr. DABBAGH for Norcos. Dr. DABBAGH stated he did not issue Norcos to

anyone. CS-2 stated that Dr. DABBAGH then wrote him/her prescriptions for

Naproxen, Ultram, and Adderall without asking CS-2 about what he/she

needed or engaging in any other conversation with CS-2. CS-2 stated that

he/she paid $75 for the visit and left the office. CS-2 stated that when he/she

left, the lobby was full of different patients from when he/she had arrived.

## SURVEILLANCE OBSERVATIONS

57.   DEA surveillance of Dr. DABBAGH's office led to the following

observations: (a) patients congregated outside the front doors of the office

waiting for the open of business; (b) an overflow of patients congregated

outside the office and its adjacent parking lots; (c) the parking lots were full of

both patients and/or vehicles being driven by the patients; (d) patients were

dropped off at the offices and later picked up; (e) the vehicular traffic in and

out of parking lots was ongoing; (f) several vehicles showed up with one to

three passengers, with all of them going inside the office and leaving a while

later with prescriptions, receipts, and paperwork in hand; and (g) patients

were seen leaving the office and meeting up with other patients, or people

waiting in the parking lot, and then going their own way.

58.   DEA investigators are aware through experience that the offices of physicians

operating "prescription mills" have the types of activities just described.

59.   DEA also observed Dr. DABBAGH on several occasions transport a

satchel/briefcase containing unknown items from the residence at 5000 Town

Center, Southfield, Michigan, to his office located at 28800 Ryan Road,
Warren, Michigan.

60. DEA verified with a United States Postal Service Investigator that mail was
being delivered to Dr. DABBAGH/Mamoun DABBAGH at unit #2004 at
5000 Town Center, Southfield, Michigan.

## CASH BUSINESS

61. Investigation revealed that cash collected during the day at Dr. DABBAGH's
office amounted to thousands of dollars and possibly in excess of $10,000.

62. It is well known by DEA investigators that individuals involved in the
prescribing of controlled substances to patients outside the normal course of
professional practice and for no legitimate medical purpose generate large
amounts of U.S. currency.

63. DEA investigators were unable to identify a meaningful, legitimate source of
income for Dr. DABBAGH.

## SEARCH WARRANTS

64. On October 20, 2014, DEA agents executing a federal search warrant at the
office of Dr. DABBAGH located at 28800 Ryan Road, Suite 320, Warren,
Michigan seized, among other things, $12,186.00 in U.S. Currency from Dr.
DABBAGH's desk, as proceeds of Dr. DABBAGH's unlawful activity.

65. On October 20, 2014, DEA agents executing a federal search warrant at the residence of Dr. DABBAGH located at 5000 Town Center, Apartment 2004, Southfield, Michigan seized, among other things,

    a.    Nineteenth-Century French Empire Style Harp;

    b.    1960 French Style Bronze Ormolu and Marble Clock;

    c.    Seven (7) Assorted Paintings;

    d.    Four (4) Assorted Metallic Sculptures;

    e.    Thirty Four (34) Assorted Crystal Glass Vases and Figurines;

    f.    Eight (8) Assorted Sculptures/Figurines;

as proceeds of or derived from the proceeds of Dr. DABBAGH's unlawful activity.

## CLAIM

66. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs, including any subparagraphs thereunder.

67. The defendants *in rem* constitute proceeds of and/or are funds that are traceable to the proceeds of illegal activity, specifically controlled substance offenses, in violation of 21 U.S.C. § 841 and § 846, and are, therefore, subject to seizure and civil forfeiture to the United States, pursuant to 21 U.S.C. § 881(a)(6).

**RELIEF**

WHEREFORE Plaintiff, the United States of America, respectfully requests that warrants for arrest of the defendants *in rem* be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendants *in rem* be condemned and forfeited to the United States of America.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

PAUL A. KUEBLER
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9641
paul.kuebler@usdoj.gov
(NY 4268561)

Dated: 10/26/2015

## **VERIFICATION**

I, James M. Gilchrist, state that I am a Task Force Officer with the United States Drug Enforcement Administration. I have read the foregoing Complaint for Forfeiture and assert that the facts contained therein are true to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement agents.

_____
Task Force Officer James M. Gilchrist
United States Drug Enforcement Administration

Dated: 10/26/2015